**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ALEXIS RODRIGUEZ,

                    Petitioner,

        v.                                          9:19-CV-0885
                                                    (GTS/CFH)

CHRISTOPHER MILLER, SUPERINTENDENT,

                    Respondent.

_____

**APPEARANCES:**                        **OF COUNSEL:**

ALEXIS RODRIGUEZ
Petitioner, pro se
16-A-0231
Great Meadow Correctional Facility
Box 51
Comstock, New York 12821

HON. LETITIA JAMES                      PAUL B. LYONS, ESQ.
Attorney for Respondent                 Assistant Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

**CHRISTIAN F. HUMMEL**
**United States Magistrate Judge**


### REPORT-RECOMMENDATION and ORDER

#### I.    INTRODUCTION

Petitioner Alexis Rodriguez ("Petitioner") seeks federal habeas corpus relief

pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet."); Dkt. No. 1-1, Memorandum

of Law in Support of Petition.  On July 25, 2019, this action was administratively closed

due to Petitioner's failure to properly commence the matter.  Dkt. No. 2, Order.

Petitioner was granted thirty days leave to either (1) pay the statutory filing fee, or (2) file a complete and properly certified in forma pauperis ("IFP") application.  *Id*. Petitioner timely submitted the filing fee, and the case was reopened.  Dkt. Entry dated 07/29/2019 (identifying receipt information for filing fee transaction); Dkt. No. 3, Text Order (reopening case).  Respondent successfully requested three extensions of time to file a response.  Dkt. Nos. 6, 8, & 10, Letter Motions (requesting an extension of time); Dkt. Nos. 7, 9, & 11, Text Orders (granting letter request).  Respondent filed a response.  Dkt. No. 12, Response; Dkt. No. 13, State Court Records ("SR").  Petitioner subsequently submitted a reply.  Dkt. No. 16, Traverse.

## II.    RELEVANT BACKGROUND

### A.  The Offense

In September 2014, Petitioner had been in an ongoing dispute with Jose Sanchez (AKA "Culito") about insurance payments for a minivan Jose Sanchez had put on the road for Petitioner.  SR 241; Dkt. No. 1-1 at 16; Dkt. No. 12 at 3.  Jose Sanchez traveled to Petitioner's home, where he resided with his family.  SR 241; Dkt. No. 1-1 at 16.  Petitioner believed Jose Sanchez was alone and instructed him to come upstairs. Dkt. No. 1-1 at 16.  Jose Sanchez entered the residence and walked upstairs, joined by his two brothers – Victor E. Sanchez and Victor M. Sanchez – and another man, Victor Marin (AKA "Pito Hulk").  SR 241-42; Dkt. No. 1-1 at 16; Dkt. No. 12 at 3.  The four men carried guns and instructed Petitioner's wife and children to lay on the floor in the living room.  SR 250-51; Dkt. No. 1-1 at 17.  Petitioner asked Jose Sanchez what he was doing, and Sanchez informed Petitioner he wanted the money he was owed or something else of value.  SR 251; Dkt. No. 1-1 at 17.

Petitioner told Sanchez he could keep the minivan and, if Petitioner was unable to repay him, Sanchez could sell the van.  SR 252; Dkt. No. 1-1 at 17.  Petitioner also stated the police had not been called.  Dkt. No. 1-1 at 17.  Victor Marin told Petitioner "if nobody calls the police, it ends here, but if somebody rats out, we are going to kill them."  *Id*.  Following the incident, Petitioner explained to another man, "El Menor," what had happened to himself and his family.  SR 255-56; Dkt. No. 1-1 at 17-18.  El Menor made a phone call and informed Petitioner he would be able to help him find, and retrieve, the minivan from Jose Sanchez.  SR 256-57; Dkt. No. 1-1 at 18.

Petitioner subsequently set aside $200 from money used for rent to pay Sanchez the money owed for the minivan.  SR 258; Dkt. No. 1-1 at 18.  On November 24, 2014, Petitioner, joined by El Menor and two other men – "Los Santana" and "D Santana" – sought to reclaim the minivan.  SR 258-64; Dkt. No. 1-1 at 18; Dkt. No. 12 at 3.  The four traveled to Jose Sanchez's residence armed with a rifle and a handgun.  SR 261, 266; Dkt. No. 1-1 at 18; Dkt. No. 12 at 3.  Petitioner approached a car where Jose Sanchez was sitting with his wife and one of his brothers.  SR 264-65; Dkt. No. 1-1 at 18.  Petitioner told Jose Sanchez, the brother seated in the car, and the other brother located in the residence nearby to come outside.  SR 267; Dkt. No. 1-1 at 18.  The brother inside the residence refused, and the brother who had been in the car exited and began fighting with El Menor, Los, and D.  SR 267; Dkt. No. 1-1 at 18.  Los began stabbing the brother, and D beat him with the handgun.  SR 267-69; Dkt. No. 12 at 4.

Petitioner informed Jose Sanchez that he had the money he owed Sanchez, and Petitioner wanted his van back.  SR 267-68; Dkt. No. 1-1 at 18.  The encounter escalated, and Jose Sanchez punched Petitioner in the face.  SR 269; Dkt. No. 1-1 at

3

18-19.  Jose Sanchez then turned to assist his brother but was stabbed by Los.  SR 269; Dkt. No. 12 at 4.

Jose Sanchez began running towards Petitioner but was shot, two or three times by D, and collapsed to the ground.  SR 269; Dkt. No. 12 at 4.  Petitioner then shot Jose Sanchez with the assault rifle an additional five times, killing him.  SR 269; Dkt. No. 12 at 4.[1]  Following the altercation, Petitioner, El Menor, Los, and D left the scene.  Dkt. No. 1-1 at 19; Dkt. No. 12 at 4.

On December 8, 2014, Petitioner was arrested for the murder of Jose Sanchez.  SR 306.  Petitioner, with the assistance of a translator, gave a statement to Schenectady Police Department Officers.  SR 306-07.  Petitioner explained he owed money to Jose Sanchez, and Sanchez invaded his home in an attempt to collect the money.  SR 306.  Petitioner further explained how he, El Menor, Los, and D traveled armed to Sanchez's house, confronted Sanchez and Sanchez's brothers, and engaged in an altercation.  SR 307.  Petitioner admitted he shot Jose Sanchez and left the scene of the incident.  *Id*.  Sometime thereafter, the People began drafting a cooperation agreement with Petitioner's attorney.  Dkt. No. 12 at 4.

On or about December 19, 2014, the Schenectady Police Department showed Petitioner a photo array, and he identified an individual as Victor Marin.  SR 49-54, 112.  Petitioner testified before the Schenectady County Grand Jury on January 26, 2015, and March 10, 2015, about the murder of Jose Sanchez.  SR 222-74; *see also* Dkt. No. 12 at 4-5.  He was represented by counsel and aided by a translator.  SR 222-23.

---

[1] However, in his Memorandum of Law, Petitioner now states he retrieved the handgun from D, and gave the rifle to El Menor.  Dkt. No. 1-1 at 19.  He then fired two or three times at Jose Sanchez, who fell to the ground.  *Id*.  Thereafter, El Menor approached Jose Sanchez and shot at him seven to ten times.  *Id*.

The Assistant District Attorney began the January 26, 2015, session by reviewing the terms of the agreement, stating, in part: "You will continue to cooperate with the District Attorney's office, [and] the police, in any proceedings that follow . . . This can include further Grand Jury sessions, any pretrial hearings, and any trials. There could be one or more trials in front of a jury in public."  SR 226-27.  Petitioner confirmed that these were the terms of the agreement and executed a waiver of immunity.  SR 226-31.

Petitioner testified about the money he owed Jose Sanchez and that Sanchez and three others, including "Pito Hulk" (Victor Marin), came to Petitioner's house armed. SR 239-42.  Petitioner recalled informing El Menor, Los, and D what had happened.  SR 253-60.  Petitioner testified the four traveled to Jose Sanchez's residence and explained his encounter with Sanchez.  SR 263-74.  Petitioner stated, "I wanted [Jose Sanchez] to give me my van back, and that he had . . . shown a lot of disrespect to my children," referring to Sanchez's invasion of Petitioner's home.  SR 271.  Petitioner further explained he wanted Jose Sanchez's brother, who had been inside, to come out "because [Sanchez's brother] was one of the guys that was at [Petitioner's] house pointing weapons at [his] kids."  SR 272.

Based on Petitioner's representations to the Grand Jury, Victor Marin was charged with first-degree burglary.  Dkt. No. 12 at 4-5.  In an indictment dated March 26, 2015, Petitioner was charged with Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25(1) (hereinafter, "P.L."), and two counts of Assault in the First Degree, in violation of P.L. §§ 120.10(1) & (4).  SR 43-44.

**B.  Plea Agreement**

On November 4, 2015, Petitioner, represented by counsel and assisted by a court-appointed Office of Court Administration interpreter, appeared before the Honorable Matthew J. Sypniewski for a plea hearing. SR 122-44. Petitioner stated (1) he was thinking clearly; (2) he was not under the influence of any alcohol, drugs, or prescription medication; and (3) there was no reason he would be unable to understand the proceedings. SR 125. The People offered a confidential cooperation agreement, signed by all the parties, to be filed under seal based on the nature of the crimes and the subjects to which Petitioner would be asked to testify. SR 125-27.

Under the agreement, "[Petitioner would] plead guilty in the Schenectady County Court to: (1) one count of Murder in the Second Degree (P.L. section 125.25(1)), a Class A-I felony; [and] (2) one count of Assault in the First Degree (P.L. section 120.10(1)[)], a Class B violent felony." SR at 103. Petitioner would also "waive his rights to appeal or collaterally attack [the] conviction[.]" *Id*. The agreement stated:

> [Petitioner] will cooperate completely and truthfully with law enforcement authorities, including the police and the District Attorney's office, on all matters in which his cooperation is requested, including but not limited to the prosecution of Jonathan Gomez AKA "El Menor", "Los", and "D" on charges related to the murder of Jose Sanchez and the assault of Victor Sanchez. These individuals are the accomplices in his pending case. [Petitioner] hereby verifies, and it is a condition of this agreement, that his Grand Jury testimony (Dated January 26, 2015 and March 10, 2015) regarding this murder and assault was truthful. It is a condition of this agreement that he agree to look at photo array compilations in an attempt to identify the other two accomplices.

*Id*. Petitioner also agreed to refrain from committing any new crimes. *Id*. Further, the agreement provided:

> In exchange for Mr. Rodriguez's guilty plea and waiver of appeal, and after satisfactory completion of his cooperation,

> the [Petitioner] will be sentenced as follows: With respect to his guilty plea of Murder in the Second Degree (P.L. section 125.25(1)), the [Petitioner] will receive a sentence of 20 years to life; with respect to his guilty plea of Assault in the First Degree (P.L. section 120.10(1)), the [Petitioner] will receive a sentence of 20 years to run concurrently with his plea to Murder in the Second Degree and post release supervision for 5 years.  This agreement also includes stay away orders of protection for the deceased's family.

*Id*.  However, the agreement further stated:

> If Mr. Rodriguez fails to fully and successfully cooperate as described herein, or withholds material information, or knowingly provides false information to law enforcement authorities regarding the subject matter of this agreement, he will forfeit the sentencing protections of this agreement and he will be sentenced on his guilty plea to Murder in the Second Degree to 20 years to life, and will be sentenced on his guilty plea to Assault in the First Degree in a range of 10 to 20 years to run **consecutively** to his murder plea.

SR 103-04 (emphasis in original).  Petitioner's attorney confirmed the contents of the written offer were consistent with his understanding of the agreement.  SR 128. Counsel explained he had met with Petitioner in jail on a number of occasions, spoke with him over the phone, and met earlier the same day to discuss the strength of the case against him and the People's offer.  SR 128-29.

Petitioner stated that he reviewed the offer with his attorney, had enough time to go over it, understood its terms, and wished to accept the agreement.  SR 129-30.  The Court explained that if Petitioner abided by the agreement, his sentences would run concurrently; however, if Petitioner violated the agreement, he could potentially face a sentence of 40 years to life incarceration.[2]  SR 130-31.  Petitioner confirmed he reviewed the agreement with his attorney and was satisfied with the service counsel

---

[2] *See also* SR 141 (clarifying "the maximum sentence exposure could be 50 to life.").

provided.  SR 131-32.  Finally, Petitioner stated he was not threatened or forced into accepting the offer, and he was not made any additional promises not contained in the agreement.  SR 132.  Based on these responses, "the Court [found] that [Petitioner] [was] pleading knowingly, intelligently and voluntarily."  SR 137-38.  Petitioner entered a plea of guilty to both counts.  SR 138-39.

### C.  Sentencing

On January 13, 2016, Petitioner appeared before the court for sentencing.  SR 145-56, Sentencing Transcript.  Petitioner was sentenced only on the murder count, and the sentence for the assault count was adjourned.  SR 151-52.  The Court sentenced Petitioner to an indeterminate term of 20 years to life, consistent with the agreement. SR 153-54.

### D.  Petitioner's Attempt to Vacate or Withdraw the Plea and Sentencing

In August of 2016, Petitioner was asked to cooperate in the trial of the *People of the State of New York v. Victor Martin*.  SR 113.  Petitioner was called from prison to testify, but Petitioner refused to be sworn in or answer any questions.  *Id*.  On August 30, 2016, Petitioner, represented by new counsel, reappeared before Hon. Matthew J. Sypniewski.  SR 157-72.  The People argued Petitioner's refusal to testify constituted a breach of the cooperation agreement.  SR 161-62.  Petitioner's counsel averred there was no meeting of the minds, and, therefore, no contract.  SR 163.  The hearing continued the following day.  SR 173-78.  Counsel for Petitioner sought time to draft a motion to withdraw or vacate the plea.  SR 176.

On September 26, 2016, Petitioner filed a counseled motion to set aside and vacate his guilty pleas.  SR 96-100, Motion; SR 107-10, Supplemental Affidavit.  The People opposed the application.  SR 105-06, 111-17.

On December 20, 2016, the parties returned to court for oral argument on the pending motion to vacate the plea.  SR 179-94.  The People asserted that while the cooperation agreement did not mention Victor Martin by name, "by the time this agreement was entered into, [Petitioner] had already cooperated in a case against Victor Martin on three separate dates," by completing a photographic identification, giving a police statement, and testifying before a grand jury.  SR 184-85.  Petitioner's counsel argued "[t]here's never any mention of testifying in open court against Marin [in the cooperation agreement] . . . And by testifying in open court, [Petitioner] has to put his family at risk because it's a public trial now."  SR 188.

Petitioner returned to court on January 18, 2017, for the court's decision and sentencing.  SR 195-221.  The court found no basis to set aside Petitioner's plea of guilty, observing "there was absolutely no remark or statement made by the [Petitioner] that would negate the core terms of the plea agreement or call into question that it was anything but knowingly, intelligently, and voluntarily entered into."  SR 202.  Accordingly, the court denied the motion to vacate or withdraw the plea.  SR 210.  Petitioner was sentenced to a determinate term of 20 years incarceration, with 5 years post-release supervision for the assault charge, to run consecutive to the previous sentence of 20 years to life for the murder charge.  SR 217.

**E.  Direct Appeal**

Petitioner appealed to the Appellate Division, Third Department.  See *People v. Rodriguez*, 164 A.D.3d 1024 (N.Y. App. Div. 2018).[3]  In his counseled brief, he argued: (1) the trial court erred as a matter of law in its determination that Petitioner violated the terms of the cooperation agreement by refusing to testify in the prosecution of Victor Marin (SR 15-24); (2) the trial court abused its discretion in denying Petitioner's motion to withdraw his guilty pleas (SR 25-28); and (3) the enhanced sentence the trial court imposed was harsh and excessive and should be modified in the interest of justice (SR 29-30).  The People filed a response.  SR 276-300.  Petitioner filed a reply.  SR 419-28.

The Appellate Division rejected Petitioner's arguments, affirming the judgment of conviction.  *Rodriguez*, 164 A.D.3d at 1024-27.  The Court observed:

> The record demonstrates that [Petitioner] shot and murdered Sanchez in direct retaliation for the home invasion and burglary of his residence and, therefore, these two events (i.e., the burglary and the murder) are inextricably intertwined based upon participants, timing and general location.  In turn, by agreeing to the subject cooperation agreement as a condition of his negotiated plea agreement, [Petitioner] was keenly aware of his cooperation obligations—particularly since he had previously cooperated with law enforcement with respect to Marin's burglary investigation and he and his family were the alleged victims thereof—yet made a calculated and knowing decision not to honor the same by declining to testify at Marin's trial.

*Id.* at 1026.  Moreover, the Appellate Division found the trial court did not err in imposing consecutive sentences based on Petitioner's failure to comply with the cooperation agreement.  *Id.*  Finally, the Court was unpersuaded that the imposition of an enhanced sentence was harsh and excessive.  *Id.* at 1027.

---

[3] A copy of the Third Department's decision is available in the State Court Records. *See* SR 432-38.

Petitioner sought leave to appeal, and, on April 2, 2019, the Court of Appeals affirmed the order of the Appellate Division. *See People v. Rodriguez*, 33 N.Y.3d 956, 957-58 (2019).[4]  The majority declared "[t]he plain language of the agreement was objectively susceptible to but one interpretation," and the trial court neither erred in determining Petitioner's refusal to testify against Marin violated the express terms of the agreement nor abused its discretion by denying Petitioner's motion to withdraw his guilty plea. *Id*. at 957.[5]

## III.    PETITION

Petitioner challenges his judgment of conviction in Schenectady County, upon a guilty plea of murder in the second degree and assault in the first degree.  Pet. at 1. Petitioner argues he is entitled to federal habeas relief because: (1) the state violated the terms of the cooperation agreement, and (2) his plea of guilty was not knowing or voluntary.  Pet. at 4-6.  Respondent contends that the state did not violate the terms of the cooperation agreement because (1) Petitioner was required to testify in the home invasion case that provided the motivation for the murder and assault, and (2) Petitioner's guilty plea was knowing, intelligent, and voluntary.  Dkt. No. 12 at 19-24.

## IV.    DISCUSSION

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based on the record before the state court, the state court's

---

[4] A copy of the Court of Appeals' decision is available in the State Court Records. *See* SR 485-502.
[5] The Court of Appeals also determined that Petitioner's ineffective assistance of counsel argument lacked merit.   *Rodriguez,* 123 N.E.3d at 256; SR 487.

decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks omitted). "'If this standard is difficult to meet' — and it is — 'that is because it was meant to be.'" *Burt v. Titlow*, 571 U.S. 10, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

In addition to the standard of review imposed by AEDPA, the petitioner must also show that any constitutional error had a "substantial and injurious effect or influence" on the verdict to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). Where there is no reasoned decision of the state court addressing the ground or grounds raised on the merits, and no independent state grounds exist for not addressing those grounds, this Court must

decide the issues *de novo* on the record before it.  *See Dolphy v. Mantello*, 552 F.3d

236, 239-40 (2d Cir. 2009) (citing *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### B. The State Courts' Finding that Petitioner's Refusal to Testify Against Marin Constituted a Breach of the Cooperation Agreement does not Warrant Habeas Relief

Petitioner contends the New York State Courts' decisions – affirming that

Petitioner's refusal to testify against Marin violated the terms of the cooperation

agreement and that the imposition of consecutive sentences was not erroneous – "were

based upon an unreasonable determination of the facts and in direct contravention of

Supreme Court precedent."  Dkt. No. 1-1 at 24.

### 1. The Court of Appeals' Decision was not "Contrary to" and did not Involve an "Unreasonable Application of" Clearly Established Federal Law

Under the "clearly established Federal law" clause, § 2254(d)(1), a state court adjudication is "contrary to" Supreme Court precedent if it "contradicts the governing [Supreme Court] law" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."

*Laboriel v. Lee*, No. 21-338-PR, 2022 WL 4479527, at *1 (2d Cir. Sept. 27, 2022)

[6](quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  An "unreasonable

application of" clearly established federal law occurs when the state court "correctly

identifies the governing legal rule but applies that rule unreasonably to the facts of a

particular prisoner's case."  *White v. Woodall*, 572 U.S. 415, 426 (2014).  Such holdings

must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice."

*Id*. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)).  "'Clearly

---

[6] Unless otherwise indicated, copies of all unpublished cases cited within this Report-Recommendation & Order have been provided to petitioner.

established federal law' means 'the holdings, as opposed to the dicta,' of the decisions [of the United States Supreme Court] as of the time of the relevant state-court decision," and does not include opinions of lower federal appellate courts.  *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)); *see also Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) ("[C]ircuit [Court] precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' . . . It therefore cannot form the basis for habeas relief under AEDPA.").

Here, Petitioner has failed to identify a source of Supreme Court precedent that the Court of Appeals' decision contradicted or applied unreasonably.  Rather, Petitioner cites a series of cases, without explaining how the State Courts violated the rules contained therein.

Petitioner states, "[i]n general, the remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order the specific performance of the agreement."  Dkt. No. 1-1 at 21 (citing *Santobello v. New York*, 404 U.S. 257, 262-63 (1971)) (internal quotations omitted).  Although Petitioner correctly identifies precedent that constitutes "clearly established federal law," his conclusion presupposes a breached plea agreement.  Here, that was not the case, and Petitioner is unable to otherwise explain how the Court of Appeals failed to apply that precedent.[7]  The Court of Appeals agreed with the People's interpretation of the cooperation agreement, requiring Petitioner to testify against Marin.  *Rodriguez*, 99 N.Y.S.3d at 772.

---

[7] *See U.S. v. Alexander*, 869 F.2d 91, 94 (2d Cir. 1989) ("It is now well settled that, when the government breaches a plea agreement, a defendant's remedy is either specific performance of the plea agreement or an opportunity to withdraw his guilty plea.") (citing *Santobello v. New York*, 404 U.S. 257, 262-63 (1971)) (additional citations omitted); *see also Larweth v. Conway*, 493 F.Supp.2d 662, 674 (W.D.N.Y. 2007) (Explaining in a habeas corpus case "[a]s a matter of both federal and state law, it is well settled that, when the prosecution breaches a plea agreement, a defendant's remedy is either specific performance of the plea agreement or an opportunity to withdraw his guilty plea" (citations omitted)).

Specifically, the Court of Appeals did not contradict or incorrectly apply the remedy proscribed in *Santobello*, it instead held that Petitioner was not entitled to any remedy because there was no breach of the plea agreement on the People's behalf.  *See id*. Accordingly, Petitioner's argument is unpersuasive.

Petitioner further avers, "[i]t is firmly established Supreme Court precedent that a breach of a plea agreement does not implicate the question of whether the sentence might have been different, the focus, instead, is on the effect of the breach on the underlying plea itself."  Dkt. No. 1-1 at 33 (citing *Santobello*).  Again, Petitioner fails to identify how the Court of Appeals failed to abide by this precedent.  The Court of Appeals found no breach on the People's behalf, so it could not have erroneously failed to focus on how a breach, which did not occur, effected the underlying plea itself.

Petitioner also outlines several "clearly applicable federal contract law principles" that the New York State Courts failed to include in their determinations:

> Cooperation agreements are interpreted according to the principles of contract law (see, *United States v. Hon*, 17 F.3d 21, 26 (2d Cir. 1994)[)].  The Court must look to Petitioner's "reasonable understanding" of the contract's terms (see, *United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000) (holding that "The Court looks to the reasonable understanding of the parties as to the terms of the agreement in determining whether a plea agreement has been breach[ed]")).  Here, the State Courts failed to apply contract law principles, requiring vacation of the guilty plea.  All ambiguities in the cooperation agreement "must be resolved in favor of Petitioner" (see, *United States v. Aluzzo*, 943 F.Supp. 243, 245 ([E.D.N.Y.] 1996)).

Dkt. No. 1-1 at 35.  First, Petitioner relies solely on judicial holdings from the Second Circuit, an intermediate appellate court.  This is insufficient to constitute clearly established federal law during habeas review.  As stated above, "clearly established

federal law" means the holdings of the decisions of the United States Supreme Court.
*See Green*, 414 F.3d at 296; *Parker*, 567 U.S. at 48-49.

Second, even if, *arguendo*, these principles did constitute "clearly established federal law" for the purposes of habeas corpus review, Petitioner has not demonstrated how the State Courts contradicted or unreasonably applied these principles. The State Courts did not decline to interpret the cooperation agreement according to contract law principles. Rather, the Court of Appeals analyzed the parties' reasonable understanding of the terms of the agreement, explaining:

> [Petitioner] promised to 'cooperate completely and truthfully with law enforcement authorities, including the police and [the] District Attorney's Office, on all matters in which his cooperation is requested . . . ' [and that w]hen [Petitioner] signed the agreement, he already had testified to Marin's involvement in the home invasion before the grand jury in the Sanchez matter, and he had also assisted the police with their investigation of the home invasion by identifying Marin in a photo array.

*Rodriguez*, 33 N.Y.3d at 957 (quoting Cooperation Agreement, available at SR 103-04). In other words, the Court of Appeals *applied contract law principles to analyze the parties' reasonable understanding of the agreement*, and concluded that Petitioner would have reasonably understood that his cooperation in the Marin prosecution was required. The mere fact that the Court's conclusion was contrary to Petitioner's asserted actual understanding of the agreement's terms does not render the holding in conflict with clearly established precedent.

Third, concerning the proposition that all ambiguities must be resolved in favor of Petitioner, the Court of Appeals *did not find any ambiguities in the agreement to resolve*. *See id*. ("The plain language of the agreement was objectively susceptible to but one

interpretation"). Accordingly, any argument that the Court of Appeals failed to resolve ambiguities in a manner consistent with precedent lacks merit.

Finally, Petitioner recites Supreme Court precedent discussing the significance of the constitutional rights that a defendant waives by entering a guilty plea. Petitioner avers "a 'plea bargain' is . . . a bargained[-]for[-]exchange," citing *Marby v. Johnson*; " . . . the rights the Petitioner gives up in [taking a plea bargain] are constitutional trial rights of the highest order . . . including the right to a trial by jury, the protection against self-incrimination, and the right to confront accusers," citing *Florida v. Nixon*, *Boykin v. Alabama*, & *McCarthy v. United States*; and that a waiver of these constitutional rights is "valid only if it is voluntary and knowing," citing *McCarthy* and *Machibroda v. United States*. Dkt. No. 1-1 at 37-38 (internal quotations omitted).[8] Yet again, Petitioner fails to identify any way the State Courts *contravened* or *unreasonably applied* the principles he cites. On the contrary, it is clear from the state court records that the County Court not only was conscious of the rights Petitioner would waive by entering a plea of guilty, but engaged in a lengthy colloquy with Petitioner to ensure that *he* was aware of the rights he was forfeiting. *See* SR 129-39. After being advised of those rights numerous times, by having the Court continually restate and present these waivers in different terms, Petitioner agreed to give up these rights so that he would benefit from a guilty plea. As the State Courts' decisions in no way contradicted the precedents Petitioner lists, these arguments are without merit.

---

[8] *See Marby v. Johnson*,467 U.S. 504, 508 (1984); *Florida v. Nixon*, 543 U.S. 175, 178 (2004); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *McCarthy v. United States*, 394 U.S. 459, 466 (1969); *Machibroda v. United States*, 368 U.S. 487, 493 (1962).

In sum, to prevail on habeas review under 28 U.S.C. § 2254(d)(1), Petitioner was obligated to prove that the Court of Appeals' decision involved "an unreasonable application of," or was "contrary to," clearly established Supreme Court precedent. *See, e.g., Cullen v. Pinholster*, 563 U.S. at 181. Petitioner failed to identify any precedent the Court of Appeals violated; therefore, habeas relief is unwarranted. *See Gifford v. Thomas*, No. 9:19-CV-0194 (GLS/DJS), 2020 WL 5822102, at *6 (N.D.N.Y. Sept. 11, 2020) ("Petitioner has provided no evidence, other than his own subjective understanding of the plea agreement, that the [State Court] misconstrued the plea agreement . . . Therefore, Petitioner has not rebutted the presumption that the [State Court's] interpretation of the plea agreement is correct by clear and convincing evidence.").

### 2. The Court of Appeals' Decision was not "Based on an Unreasonable Determination of the Facts in Light of the Evidence Presented"

Petitioner next argues that he is entitled to habeas corpus relief because "[t]he [State Courts' decisions were] based upon an unreasonable determination of the facts as presented[.]" Dkt. No. 1-1 at 32. A state court's findings of fact are presumed correct unless the petitioner rebuts the presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) ("When reviewing a habeas petition, '[t]he factual findings of the New York Courts are presumed to be correct.'") (quoting *Green v. Scully*, 850 F.2d 894, 900 (2d Cir. 1988)). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was

incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

To be entitled to habeas relief, therefore, Petitioner must prove the Court of Appeals' conclusion – that the cooperation agreement required Petitioner to testify against Marin – was based on an unreasonable determination of the facts. The Court of Appeals found that "[t]he plain language of the agreement was objectively susceptible to but one interpretation" in holding that the trial court did not abuse its discretion when it concluded that Petitioner "reasonably understood that his cooperation in the Marin prosecution was required" and denied Petitioner's motion to withdraw his guilty plea. SR 486-87; *Rodriguez*, 33 N.Y.3d at 957 (citing, *inter alia*, *People v. Cataldo*, 39 N.Y.2d 578, 580 (1976) (holding that "[c]ompliance with a plea bargain is to be tested against an objective reading of the bargain, and not against a defendant's subjective interpretation thereof.").

In reaching this conclusion, the Court of Appeals explained

> [Petitioner] promised to "cooperate completely and truthfully with law enforcement authorities, including the police and the District Attorney's Office, on all matters in which his cooperation is requested, including but not limited to the prosecution of [[Petitioner's] accomplices] on charges related to the murder of Jose Sanchez and the assault of [Sanchez's brother],"

accurately quoting the cooperation agreement Petitioner signed. *Rodriguez*, 33 N.Y.3d at 957. The Court also relied on Petitioner's actions before entering the cooperation agreement. *See id*. The Court of Appeals emphasized *prior to signing the agreement*, (1) "[Petitioner] had confessed to his involvement in the . . . murder and assault, explaining that the crimes were retaliation for a prior invasion of [his] home by Sanchez

and . . . Marin;" (2) "[Petitioner] had testified to Marin's involvement in the home invasion before the grand jury . . . ;" and (3) "[Petitioner] had assisted the police with their investigation of the home invasion by identifying Marin in a photo array." *Id.*

All of these facts are consistent with the evidence presented. *See* SR 306, Petitioner's Police Affidavit, dated December 8, 2014 (explaining, sometime around the end of September, "Culito [Jose Sanchez], his two brothers and Pito Hulk [Marin] came in my house and all 4 of them had guns . . . [after Petitioner offered the minivan to Sanchez, Marin] and [Jose Sanchez] [came] back and knocked on the door. [They] still had the guns and said [n]o one call[] the police . . . [Marin] said if nobody calls it ends here. But if somebody rats out we are gonna kill them."); SR 251; 250-54, Petitioner's Grand Jury Testimony, January 26, 2015 (Petitioner, under oath, testified about the invasion of his home, explaining Jose Sanchez, his brothers, and Marin "[w]ere armed [], and they were pointing at my kids' faces with the weapons and told them to get on the ground," and "[Petitioner's] kids were pretty traumatized because they had pointed the guns right at their face[s] . . . "); SR 112, Affidavit of Assistant District Attorney, Brian S. Gray ("On December 19, 2014, [Petitioner] was shown a photo array of Victor Marin. [Petitioner] picked Victor Marin out of the photo array and identified him as being at his house with a pistol during the home invasion."); SR 103-04, Confidential Cooperation Agreement, dated November 4, 2015; SR 122-44, Plea Hearing, November 4, 2015 (County Court accepted signed Cooperation Agreement).

The Court of Appeals concluded the County Court "did not abuse its discretion . . . by concluding . . . that [Petitioner] reasonably understood that his cooperation in the Marin prosecution was required." *Rodriguez*, 33 N.Y.3d at 957. Neither the Court of

Appeals' recitation of the terms of the agreement, nor its narration of the events surrounding Petitioner's acceptance of the agreement, were inaccurate or otherwise "unreasonable."  Instead, the Court of Appeals' decision shows that Petitioner provided testimony about Marin to a Grand Jury, provided an identification of Marin to Police Officers, and agreed to further cooperate in the future.  Petitioner repeatedly argues that the cooperation agreement could not require his participation in the Marin trial because it does not even list Marin by name,[9] but, the Court of Appeals found support for Petitioner's obligation to testify against Marin in his promise to testify on *all matters in which his cooperation is requested* related to the murder of Jose Sanchez.  *See id.* Petitioner himself explained to the Grand Jury how the invasion of Petitioner's home led him to murder Jose Sanchez, thus, the court's conclusion that the two events were "related" is not unreasonable.

Because Petitioner has failed to rebut, by clear and convincing evidence, that the state courts' findings of fact were incorrect, habeas relief is not warranted on this claim. *See* 28 U.S.C. § 2254(e)(1).

### C.  Petitioner's Plea of Guilty was not Unknowingly or Involuntarily Entered

Petitioner also contends he is entitled to habeas corpus relief because his plea of guilty to murder in the second degree and assault in the first degree was not knowingly or voluntarily entered.  Pet. at 6-7.  Petitioner avers he entered a plea of guilty "with an understanding that the cooperation agreement parameters were satisfied, not requiring any further obligations . . . [and that he] had not agreed – nor would he – to testify

---

[9] *See, e.g.*, Dkt. No. 1-1 at 26 ("It cannot reasonably be disputed that the plain language of the cooperation agreement does not mention either the home invasion or the prosecution of Marin").

against Marin . . . ." Pet. at 6.[10]  Because there is no reasoned decision on the merits of this argument, the undersigned will review the issue *de novo*. *See Dolphy*, 552 F.3d at 239-40.

To comply with constitutional due process protections, a guilty plea must be knowing, voluntary, and intelligent. *See United States v. Ruiz*, 536 U.S. 622, 628-29 (2002) (citing *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *Brady v. United States*, 397 U.S. 742, 748 (1970)).  "A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183, (2005) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).  "[I]f a . . . guilty plea is not . . . voluntary and knowing, it has been obtained in violation of due process and is therefore void." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (citing *McCarthy v. United States*, 394 U.S. 459, 466 (1969)).  The test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice

---

[10] Petitioner's claim that his plea of guilty was not knowingly or voluntarily entered is unexhausted.  An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(A), (B)(i), (ii); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("State prisoners must give the state courts one full opportunity to resolve any constitutional issues[.]").  Petitioner did not argue in his briefs to the Appellate Division or Court of Appeals that his plea of guilty should be withdrawn or vacated *because it was not knowing, voluntary, and intelligent. See* SR 3-31, Petitioner's Appellate Division Brief; SR 419-28, Petitioner's Appellate Division Reply Brief; SR 440-62, Petitioner's Letter Brief in the Court of Appeals; SR 474-81, Petitioner's Reply Letter in the Court of Appeals.  Therefore, neither the Appellate Division nor the Court of Appeals decided whether the plea was knowing, voluntary, and intelligent as required by due process.  *See* SR 432-38, Appellate Division Decision; SR 485-502, Court of Appeals Decision.  However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).  This is particularly true where the grounds raised are meritless.  *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).  Accordingly, the undersigned declines to dismiss the claim solely on exhaustion grounds and will instead reach the merits.

among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citations omitted).

Petitioner does not claim his guilty plea was involuntary because of some external influence, rather, Petitioner argues that he entered his plea of guilty for the murder and assault charges "without an informed understanding . . . that the sentencing promise was conditioned on his testimony at Marin's trial." Dkt. No. 1-1 at 33. In other words, Petitioner contends that he did not know that his promise to "cooperate completely and truthfully on all matters in which his cooperation [was] requested" would require him to testify against Victor Marin, and this misunderstanding of the terms of the cooperation agreement rendered his subsequent pleas of guilty unknowing and/or involuntary. *See* SR 103-04, Cooperation Agreement.

Petitioner's argument is without merit. The United States Circuit Court for the Second Circuit has rejected the argument that a petitioner should be permitted to withdraw a guilty plea based on their mistaken impression of the plea's consequences:

> Although a claim frequently asserted is that the guilty plea was entered by the prisoner in the erroneous belief, induced by discussions with his lawyer, that he would receive a lesser sentence than that ultimately imposed or that he would be permitted to withdraw his guilty plea, this has repeatedly been held insufficient to warrant the issuance of a writ [of habeas corpus]. [Collecting cases]. *We see no sound reason for not applying the same principle to petitions based on other types of subjective mistaken impression.* To hold otherwise would be to provide every prisoner with an opportunity to start out with a guilty plea, with the assurance that if he should later be disappointed at the treatment accorded him he could withdraw his plea and demand a trial on the ground that at the time of his guilty plea he had labored under an erroneous impression as to what would happen to him after acceptance of the plea.

*U.S. ex rel. Curtis v. Zelker*, 466 F.2d 1092, 1098 (2d Cir. 1972) (emphasis added) (citations omitted); *see also Schmitt v. Ercole*, No. 08-CV-0036, 2010 WL 2465532, at *6 (W.D.N.Y. Jun. 14, 2010) ("[E]ven [accepting] petitioner's factual allegation that he misunderstood the potential minimum sentence arising out of his guilty plea, that fact would still not render petitioner's plea involuntary.") (*citing Curtis*, 466 F.2d at 1098); *Moore v. Woods*, No. 9:05-CV-1165 (GTS/GJD), 2009 WL 837889, at *1-2 (N.D.N.Y. Mar. 26, 2009) ("Petitioner argues that he reasonably misunderstood the plea agreement that he entered into . . . Even if Petitioner indeed misunderstood the plea agreement when he entered into it, any such misunderstanding was not reasonable, given his opportunity to consult with counsel, and the trial judge's repeated admonitions."). Here, it is apparent from the record that the Court repeatedly ensured that (1) Petitioner could understand the proceedings, and the translation of the Court Interpreter; (2) Petitioner had time to go over the agreement with his attorney; (3) Petitioner understood the terms of the agreement; and (4) that the Court would not be bound by the agreement if Petitioner violated its terms, potentially exposing Petitioner to a sentence of 40 years to life incarceration. *See* SR 124-25; 129-39. Accordingly, Petitioner's claimed subjective misunderstanding of the requirements of the cooperation agreement does not warrant habeas corpus relief.

Moreover, to the extent Petitioner argues his plea was rendered involuntary by a breach of the cooperation agreement on the government's behalf,[11] he is also incorrect. First, as explained above, it was Petitioner, not the People, who breached the

---

[11] *See, e.g.*, Dkt. No. 1-1 at 36 ("When the earlier waiver [of constitutional trial rights] is rendered involuntary by a State breach that effectively imposes new terms on the agreement, *only* a new personal waiver by Petitioner in light of those new terms on the agreement can reestablish the voluntariness of the plea. Absent a new waiver, Petitioner's plea must be withdrawn as involuntary.") (emphasis in original).

cooperation agreement.  Further, even if the government had breached the cooperation agreement, "there is nothing to support the proposition that the Government's breach of a plea agreement retroactively causes the defendant's agreement to have been unknowing or involuntary." *Puckett v. United States*, 556 U.S. 129, 137 (2009).  "[I]t is entirely clear that a breach does not cause the guilty plea, when entered, to have been unknowing or involuntary." *Id*.  In other words, Petitioner made a promise to, amongst other things, cooperate with law enforcement authorities, in exchange for a promise that his sentence for the assault charge would run concurrently with his sentence for the murder charge, rather than consecutively.  *See* 103-04, Cooperation Agreement.  If the People had breached the agreement (which they did not) by refusing to provide Petitioner the promised sentence after he cooperated, it would not render the agreement unknowing or involuntary, rather, "[i]t is precisely *because* the plea was knowing and voluntary (and hence valid) that the [People are] obligated to uphold its side of the bargain." *Puckett*, 556 U.S. at 137-38 (emphasis in original).[12]

Finally, Petitioner's choice to enter a plea of guilty and comply with the cooperation agreement was not otherwise invalid.  Petitioner argues "[if he] testified in a public trial against Marin, it would present a very dangerous, life-threatening situation for

---

[12] See also *Puckett*, 556 U.S. at 137:

> Although the analogy may not hold in all respects, plea bargains are essentially contracts . . . When the consideration for a contract fails—that is, when one of the exchanged promises is not kept—we do not say that the voluntary bilateral consent to the contract never existed, so that it is automatically and utterly void; we say that the contract was broken . . . The party injured by the breach will generally be entitled to some remedy, which might include the right to rescind the contract entirely . . . but that is not the same thing as saying the contract was never validly concluded . . . When a defendant agrees to a plea bargain, the Government takes on certain obligations. If those obligations are not met, the defendant is entitled to seek a remedy . . . [But] a breach does not cause the guilty plea, when entered, to have been unknowing or involuntary.

[his] family. Petitioner would have never agreed to such a risky proposition."  Dkt. No. 1-1 at 15.

 "A court may determine whether a defendant knowingly and voluntarily entered into a plea bargain by, among other things, his allocution statements."  *Carpenter v. Unger*, Nos. 9:10-CV-1240 (GTS/TWD), 9:12-CV-0957 (GTS/TWD), 2014 WL 4105398, at *19 (N.D.N.Y. Aug. 20, 2014) (citing *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997)).  A defendant's statements under oath at a plea allocution "carry a strong presumption of verity" and "constitute a formidable barrier in any subsequent collateral proceedings."  *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).  Such statements "are generally treated as conclusive in the face of the defendant's later attempt to contradict them."  *Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999) (citing *United States v. Gonzalez*, 970 F.2d 1095, 1101 (2d Cir. 1992)).

To establish that a plea of guilty was entered knowingly, intelligently, and voluntarily,

> [T]he court must find, based upon the record of the relevant plea proceedings, that [the defendant] 1) was competent to proceed and was fully aware of the nature of the charges faced; 2) had a rational and factual understanding of the proceedings; and, 3) was cognizant of the constitutional protections relinquished upon entry of the plea.

*Capra v. LeClair*, No. 9:06-CV-1230 (GTS/DEP), 2010 WL 3323676, at *9 (N.D.N.Y. Apr. 12, 2010) (citing *Oyague v. Artuz*, 393 F.3d 99, 106 (2d Cir. 2004)).  The test for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citations omitted).  "[A] plea is deemed 'intelligent' if the accused had the advice of counsel and understood the consequences

of his plea, even if only in a fairly rudimentary way[.]"  *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988).  A plea "is deemed 'voluntary' if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally."  *Id.* at 1320.

It is evident from the record that Petitioner's plea was voluntary, knowing, and intelligent.  Before accepting Petitioner's plea, the Court confirmed that Petitioner was able to understand the Court Interpreter's translations, thinking clearly, and able to understand the proceedings.  SR 124-25.  Petitioner expressed satisfaction with counsel's representation, stating he had ample time to discuss the contents of the cooperation agreement.  SR 129-30; 131-32.  Petitioner affirmed that he understood all of the terms of the agreement, and he had no further questions about its contents.  SR 129-30.  The Court explained the rights Petitioner would waive by entering a plea of guilty – including the presumption of innocence, the right to a trial, the right to present and cross examine witnesses, and the right to testify on his own behalf – and the consequences Petitioner would face if he violated the agreements terms.  SR 130-37.  Petitioner assured the Court there was not anyone threatening or forcing him to accept the offer, and that he believed it was in his best interest to accept the offer.  SR 132.  In sum, Petitioner's statements indicate that, after consultation with counsel, he was aware of and understood what was expected of him, the rights he was forfeiting, and the potential consequences.  Further, Petitioner agreed that pleading guilty was the best option for him.  Therefore, any claim by Petitioner that he lacked a rudimentary understanding of the plea is without merit.  *See Miller*, 848 F.2d at 1320.

While Petitioner may now be dissatisfied with his obligations under the cooperation agreement, he is unable to demonstrate his entry of a plea of guilty was not knowing, voluntary, and intelligent.  Accordingly, he is not entitled to habeas relief.

## V.    CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

**ORDERED**, that the Clerk of the Court shall provide petitioner with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*); and it is further

**RECOMMENDED**, that no Certificate of Appealability ("COA") shall issue because petitioner has failed to make a "substantial showing of the denial of a constitutional right" as 28 U.S.C. § 2253(c)(2) requires;[13] and it is further

**RECOMMENDED**, that any further request for a Certificate of Appealability must be addressed to the Court of Appeals (FED. R. APP. P. 22(b)); and it is further

**ORDERED**, that the Clerk shall serve a copy of this Report-Recommendation and Order upon the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**</u>

---

[13] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation" (emphasis in original)).

**(14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: December 1, 2022
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge